# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOSEPHINE SMALLS MILLER<br><br>    Plaintiff,<br><br>    v.<br><br>SUZANNE SUTTON (I/O CAPACITY)<br>KARYL CARRASQUILLA (I/O CAPACITY)<br>MICHAEL BOWLER (I/O CAPACITY)<br><br>    Defendants. | No. 3:15-cv-1111 (MPS) |

## MEMORANDUM AND ORDER

*Pro se* Plaintiff, Josephine Smalls Miller, a Connecticut attorney, brings this lawsuit against Karyl Carrasquilla, Chief Disciplinary Counsel of the State of Connecticut Office of the Chief Disciplinary Counsel ("OCDC"); Suzanne Sutton, First Assistant Chief Disciplinary Counsel; and Michael Bowler, Bar Counsel for the Statewide Grievance Committee ("SGC") ("Defendants"). (Third Amended Complaint, ECF No. 36 ("TAC") ¶¶ 3-5.)[1]

In Counts One and Two, Miller alleges that Defendants violated her rights under the Due Process and Equal Protection clauses of the Fourteenth Amendment, respectively. (TAC at 13-14.) In Counts Three and Four, Miller alleges that Sutton and Bowler, respectively—in their individual capacities—interfered with Miller's rights under 42 U.S.C. § 1983 to use the federal district courts to make claims of race discrimination. (*Id*. at 14-15.) Finally, in Count Five, Miller

---

[1] Beth Baldwin of the OCDC was a defendant in previous versions of Miller's complaint. Although Baldwin's name appears in several paragraphs of the TAC, she is not listed as a defendant anywhere in the TAC, and her name is not listed in the caption of the TAC as a defendant. In addition, Miller's motion for reconsideration regarding the stay of discovery states that Miller substituted Carrasquilla for Baldwin in the TAC. (ECF No. 37 at 1.) Therefore, the Court no longer considers Baldwin a defendant in this case. *See* Fed. R. Civ. P. 10(a).

alleges that Defendants violated her First Amendment right to petition the government for redress of grievances. (*Id.* at 15.) Miller seeks to enjoin Defendants from pursuing: (1) "any claim of the additional allegations of professional misconduct in any grievance hearing or other manner"; (2) "any reprimand, suspension or other sanction against Plaintiff for the additional allegations of professional misconduct"; (3) "any claim of professional misconduct for filing claims of racial discrimination or other civil rights claims on behalf of Plaintiff's clients." (*Id.* at 17.) She does not seek monetary damages. (*Id.*)[2]

Defendants have moved to dismiss the TAC under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of jurisdiction and failure to state a claim on which relief can be granted, respectively. Defendants argue that: (1) the doctrine of *Younger* abstention bars the Court from considering this case, (2) the case is moot, (3) Miller fails to state a claim upon which relief can be granted, and (4) Defendants are entitled to absolute quasi-judicial immunity for the individual capacity claims against them. (ECF No. 34-1 at 12.) For the reasons set forth below, the Court abstains from exercising jurisdiction and therefore GRANTS Defendants' motion to dismiss the TAC. (Defendants' Mem. Mot. Dismiss ("Defs' Br.") ECF No. 34.)

## I.      BACKGROUND[3]

Miller, who is African-American (TAC ¶¶ 13, 22), is licensed to practice law in the state of Connecticut. (*Id.* ¶ 2.) "During most of her thirty-five years of practice, [she] has specialized in employment discrimination/civil rights law." (*Id.* ¶ 7.) She sues the Defendants in both their

---

[2] In addition to injunctive relief, Miller's prayer for relief seeks attorney fees, costs, and "such other and further relief as the court deems proper." (*Id.* at 17.)

[3] The following facts are from the TAC and other documents outside of the pleadings. As discussed below, the Court may consider such documents whether the motion to dismiss is considered under Rule 12(b)(1) or Rule 12(b)(6) of the Federal Rules of Civil Procedure.

individual and official capacities. (*Id.* ¶¶ 3-5.) The OCDC and the SGC are comprised of attorneys and, in the case of the SGC, some non-attorneys who are appointed by the judges of the Connecticut Superior Court and who are charged with, among other things, enforcing state rules governing the practice of law and investigating complaints of attorney misconduct. (*Id.*; *see* Conn. Prac. Bk. §§ 2-32 – 2-38.) Because the TAC's allegations focus on proceedings involving these two agencies, some background on the rules that govern them is necessary.

### A. Connecticut Attorney Discipline

"Any person, including disciplinary counsel, or a grievance panel on its own motion, may file a written complaint, executed under penalties of false statement" with statewide bar counsel alleging attorney misconduct against a respondent attorney. Conn. Prac. Bk. § 2-32(a).[4] Within seven days of receiving a complaint, statewide bar counsel must review the complaint and either forward the complaint to the grievance panel in the judicial district in which the respondent maintains her principal office (or residence) or refer the complaint to the chair of the SGC (or an attorney designee of the chair) and a non-attorney member. *Id.*

If statewide bar counsel refers the complaint to the chair of the SGC (or an attorney designee of the chair) and a non-attorney member, the chair or attorney designee, the non-attorney, and statewide bar counsel shall, if appropriate, dismiss the complaint on one of several grounds, or stay the proceedings if the complaint alleges only a fee dispute.[5] *Id.*

---

[4] The judges of the Connecticut Superior Court appoint an attorney to act as statewide bar counsel for a term of one year. Conn. Prac. Bk. § 2-34(a).

[5] If a complaint is dismissed before being referred to a panel, the person who made the complaint (the complainant) is notified of the dismissal and the reasons therefor. Conn. Prac. Bk. § 2-32(c). The complainant then has 14 days from the date of the mailing of the notice of the dismissal to appeal the dismissal in writing. *Id.* The appeal must set forth the basis for the appeal and must be filed with statewide bar counsel, who forwards it to a reviewing committee for a final decision dismissing the complaint or forwarding it to a grievance panel for investigation. *Id.*

If statewide bar counsel forwards the complaint to a grievance panel, then the panel, with the assistance of grievance counsel[6] assigned to it, investigates the complaint "to determine whether probable cause exists that the attorney is guilty of misconduct. The grievance panel may, upon the vote of a majority of its members, require that a disciplinary counsel pursue the matter before the grievance panel on the issue of probable cause." *Id.* § 2-32(f). The respondent has thirty days from the date she is notified of the referral to the grievance panel to respond to the complaint. Conn. Prac. Bk. § 2-32(a)(1). The grievance panel may conduct a hearing on the complaint, at the request of the respondent, for good cause shown or on its own motion. *Id.* § 2-32(h). Although the complainant and respondent are entitled to be present, with their counsel, at any proceedings on the complaint at which testimony is given, they are not entitled to examine or cross-examine witnesses unless the grievance panel requests that they do so. *Id.*

The grievance panel must notify the complainant, the respondent, and the SGC of its determination.[7] *Id.* § 2-32(k). If the grievance panel determines that probable cause exists that the respondent is guilty of misconduct, the grievance panel must file its written record with the SGC and disciplinary counsel, *id.* § 2-32(i), and the determination that probable cause exists becomes a matter of public record. *Id.* § 2-32(k). Next, the SGC—or a reviewing committee

---

[6] Grievance counsel are attorneys appointed by the judges of the Superior Court. Conn. Prac. Bk. § 2-30(a). "The executive committee of the superior court . . . determine[s] the number of grievance counsel to serve one or more grievance panels." *Id.* § 2-30(c). Among other things, grievance counsel investigate complaints of attorney misconduct and assist grievance panels in carrying out their duties. *Id.* § 2-31.

[7] If the grievance panel determines that no probable cause exists, it must dismiss the complaint (unless there is an allegation that the respondent committed a crime). Such dismissal is final. Conn. Prac. Bk. § 2-32(i).

made up of at least three members of the SGC—"hold[s] a hearing on the complaint." *Id.* § 2-35(c).

Prior to such a hearing, "disciplinary counsel may add additional allegations of misconduct arising from the record of the grievance complaint or its investigation of the complaint." *Id.* § 2-35(d)(1). If disciplinary counsel "determines that additional allegations of misconduct exist," disciplinary counsel must issue a written notice to the respondent and the SGC describing the allegations and identifying the rules governing attorney conduct that the respondent allegedly violated. *Id.* § 2-35(e).

At all hearings of the SGC or the reviewing committee, the respondent and the complainant are entitled to be present, and the respondent has the right to be heard in her own defense. *Id.* § 2-35(h). Both disciplinary counsel, who is charged with "pursu[ing] the matter before the SGC or the reviewing committee," *id.* § 2-34A(b)(1), and the respondent may examine and cross-examine witnesses and shall have the opportunity to make statements. *Id.* § 2-35(h). The SGC or reviewing committee may request oral argument. *Id.* Within 90 days of the date the grievance panel files its determination with the SGC, the reviewing committee must "render a final written decision dismissing the complaint, imposing sanctions and conditions . . . , or directing the disciplinary counsel to file a presentment against the respondent in the superior court and file it with the [SGC]." *Id.* § 2-35(i).

Within 30 days of the reviewing committee's final decision, the respondent may request that the SGC review the decision. *Id.* § 2-35(k). Such a request for review must specify the basis for the review, including, among other bases, that the reviewing committee's findings were in violation of constitutional provisions. *Id.* As long as the respondent timely requests a review of the reviewing committee's decision by the SGC, the respondent may later appeal the decision to

5

the Superior Court. *Id*. § 2-38(a). The enforcement of a final decision imposing sanctions or conditions against the respondent is stayed pending review or appeal. *Id.* § 2-38(b); § 2-35(k). "The appeal shall be conducted by the court without a jury and shall be confined to the record. If alleged irregularities in procedure before the statewide grievance committee or reviewing committee are not shown in the record, proof limited thereto may be taken in the court." *Id.* § 2-38(d). In addition to filing written briefs, the parties may request that the court hear oral argument. *Id.* § 2-38(d), (e).

### B.  Allegations of the TAC

#### 1.  Referral from Judge Meyer and Additional Allegations

On May 14, 2014, Miller filed a *pro se* complaint in U.S. District Court for the District of Connecticut against the Bridgeport Police Department, Bridgeport City Attorney Mark Anastasi, and others, alleging, among other things, race discrimination, conspiracy, and tortious interference with contract. (TAC ¶ 8; *see Miller v. Bridgeport Police Department*; 3:14-cv-00689-JAM (hereafter "*BPD*").) Miller states that she was obliged to file the *BPD* action in 2014 as a separate case because U.S. District Judge Vanessa L. Bryant had refused to permit her to file an amended complaint in her 2012 *pro se* race discrimination lawsuit against the Bridgeport Board of Education and Anastasi, *Miller v. Bridgeport Board of Education* 3:12-cv-1287 (JAM) (hereafter, "*BBOE*"), a case originally assigned to Judge Bryant. (TAC ¶ 9.) (Both cases were later transferred to U.S. District Judge Jeffrey A. Meyer.)

Miller made three factual allegations in paragraphs 44-46 of her amended complaint in *BBOE*: (1) the defendants "maintained a policy, practice, and custom of engaging only non-African-American attorneys and law firms to perform legal services"; (2) defendants had "no African-American attorneys who perform legal services for it pursuant to Conn. Gen. Stat. §7-

101a"; and (3) "[r]ecords of . . . [the] Board of Education show no African-American attorneys who perform legal services for it pursuant to Conn. Gen. Stat. §7-101a." *BBOE*, ECF No. 31, ¶¶ 44-46. Believing that Miller knew these statements were false, the *BBOE* defendants advised Miller that they intended to file a motion for sanctions under Rule 11. *Miller v. Bridgeport Bd. of Educ.*, No. 3:12-CV-01287 JAM, 2014 WL 3738057, at *4 (D. Conn. July 30, 2014). On March 19, 2014, the *BBOE* defendants sent Miller a "safe harbor" letter pursuant to Fed. R. Civ. P. 11(c)(2), permitting her to withdraw or correct the allegations. *Id.* In response, Miller sent a letter stating, "This will respond to your correspondence regarding the above-captioned case. I do not intend to withdraw any pleading. Your attempt to engage in the characteristic economic terrorism is to no avail." *Id.* On April 10, 2014, the defendants filed a motion for sanctions under Rule 11. *BBOE*, ECF No. 35. After a hearing, Judge Meyer found that Miller's statements were knowingly false, granted the motion for sanctions, fined Miller $1,500, and dismissed *BBOE* with prejudice. *Bridgeport Bd. of Educ.*, 2014 WL 3738057, at *10. Judge Meyer forwarded a copy of his ruling granting the motion for sanctions to the Connecticut statewide bar counsel "for whatever further disciplinary review or action it deems appropriate." *Id.* at *12. "[T]he SGC referred the matter to a local grievance panel, which found probable cause that [Miller] had violated the Rules of Professional Conduct." (ECF No. 34-1 at 6; Ex. B, Grievance Complaint # 14-0803, Grievance Panel Finding of Probable Cause, Letter dated April 28, 2015.)

   After granting the motion for sanctions in *BBOE*, Judge Meyer found that the same statements Miller had made in the *BPD* complaint were knowingly false and granted the motion for sanctions in *BPD*. Judge Meyer did not dismiss the complaint in *BPD*, however. Instead, he allowed Miller to file an amended complaint. *BPD*, ECF No. 36. Judge Meyer ordered that Miller's amended complaint:

> not rely on any of the substantive allegations that were the basis of her prior
> lawsuit in [*BBOE*] which was dismissed with prejudice pursuant to an order
> sanctioning plaintiff for pleading several false allegations. . . . [,] not include the
> Bridgeport Board of Education as a defendant in her amended complaint and . . .
> not allege any misconduct—by any defendant—concerning the Bridgeport Board
> of Education that was alleged in [*BBOE*].

*BPD*, ECF No. 29 at 1-2. On March 18, 2015, Miller filed a second amended complaint in *BPD,*

in which she "modified the factual statements regarding race discrimination that had been

deemed by Judge Meyer to be false." (TAC ¶ 11.) Miller's amended complaint in *BPD* alleged

that the *BPD* defendants "maintained a policy, practice, and custom of engaging only majority

white law firms to perform legal services" and "retained no African-American lawyers similarly

situated to Plaintiff to perform legal services" pursuant to C.G.S. § 7-101a. (*Id.* ¶ 13.) The *BPD*

defendants filed a motion to dismiss Miller's amended complaint, but did not make any claim

that the amended complaint in *BPD*—which included these modified allegations of race

discrimination—contained false statements. (*Id.* ¶ 17.)

Nevertheless, after the local grievance panel's probable cause finding, Sutton on July 2,

2015, "filed two additional allegations of professional misconduct" against Miller, the first of

which related to her filing of the March 18, 2015 amended complaint in *BPD* (the "Additional

Allegations"). (TAC ¶¶ 12, 18; ECF No. 34-1 Ex. C.) The Additional Allegations were:

1. Respondent committed professional misconduct, including but not limited to
   violations of Rule 3.1 of the Rules of Professional Conduct in that even after
   she was found to have violated Rule 11, Respondent caused a second
   amended complaint to be filed on March 18, 2015 in [*BPD*] alleging the same
   claims of racial discrimination as were deemed in violation of Rule 11 in the
   case brought before this committee, [*BBOE*]. She has also filed an opposition
   to Defendants['] Motion to dismiss dated June 26, 2015, defending the racial
   discrimination claims based upon the same information provided to the Court
   that issued the Rule 11 violation sanction. . . .

2. Respondent committed professional misconduct, including but not limited to a
   violation of Rules 3.3(a) (1) and 8.4(3) in that she informed the Court during
   the June 10, 2014 hearing on the Rule 11 motion in [*BBOE*] that her 2010

8

> complaint, Miller v. Bridgeport Board of Education, FBT-CV-60114068 was
> dismissed because of "a conflict that I had in the scheduled trial date on
> another matter". She omitted the true nature of the dismissal . . . .

(ECF No. 34-1 Ex. C (citations omitted); TAC ¶ 12.) Miller's TAC alleges, "[u]pon information

and belief," that "defendants' intent and purpose" in making these Additional Allegations was to

restrain the exercise of her rights to make claims of racial discrimination on behalf of herself and

her clients. (TAC ¶ 19.)

On September 1, 2015, the reviewing committee of the SGC held a hearing during which

Carrasquilla presented evidence on behalf of the OCDC (TAC ¶ 20; ECF No. 43 at 7), and Miller

presented evidence in her own defense, including "evidence regarding multiple instances of other

non-African-American attorneys who engaged in the same or substantially similar conduct" as

was alleged against her, but who faced "no disciplinary action against them." (TAC ¶ 22.) Miller

alleges, "[u]pon information and belief," that the OCDC "do[es] not intend to undertake any

investigation of the substantial evidence of attorney misconduct substantially similar to that

alleged against" her. (*Id.* ¶ 23.) Miller also alleges that, at the September 1, 2015 hearing, the

reviewing committee "refused to provide [her] with appropriate due process in defense of" the

Additional Allegations, including discovery and an opportunity fully and fairly to present

evidence in her defense. (*Id.* ¶ 38.) During the hearing, Carrasquilla told the reviewing

committee that she did not believe that she had met her burden to prove the first allegation of the

Additional Allegations by clear and convincing evidence. (ECF No. 34, Ex. E at 51.)

In its decision on October 30, 2015, the reviewing committee concluded that Miller had

violated Rules 3.3(a)(1), 8.4(3), and 8.4(4) of the Rules of Professional Conduct by making

knowingly false allegations in paragraphs 44 and 45 of her amended complaint in *BBOE,* failing

to correct the false statements when given an opportunity to do so, and calling her adversary's

"safe harbor" letter "economic terrorism" instead of withdrawing or amending the false allegations after being given notice and an opportunity to do so. (ECF No. 34, Ex. F at 3.) Based on this finding, the reviewing committee reprimanded Miller. The reviewing committee found "that the record lacks clear and convincing evidence to substantiate a finding of unethical conduct . . . with regard to the additional allegations of misconduct . . . ." (ECF No. 34, Ex. F at 4.) Miller does not allege that she appealed the decision of the reviewing committee, Defendants represent that she did not (ECF No. 34 at 5), and Miller has not challenged that representation.

## 2.   Other Referrals to Local Grievance Panels

### a.   Referral of Racial Discrimination Cases

Miller also alleges that the OCDC and Sutton investigated at least two of her cases that allege racial discrimination, *Igidi v. Department of Correction* (hereafter "*Igidi*") and *Eaddy v. Department of Children & Families* (hereafter "*Eaddy*"). (TAC ¶¶ 28-29.) The OCDC then referred the cases to a local grievance panel. (*Id*. ¶ 30.)[8] Miller alleges that the OCDC's referral to the local grievance panel has chilled her constitutional rights and those of her clients "to redress grievances related to racial discrimination." (*Id*. ¶ 32.) She alleges that on November 3, 2015, the SGC, acting through Bowler, "filed a complaint" against her "based upon a referral by the Danbury Local panel, finding probable cause for, inter alia, the alleged filing of false, unmeritorious, frivolous complaints or allegations of racial discrimination that cannot be supported" in *Igidi* and *Eaddy*. (*Id*. ¶ 39.) Miller alleges that Bowler acted in concert with

---

[8] Although the Court accepts this allegation as true for purposes of deciding the Defendants' motion to dismiss, it seems likely that Miller has confused the OCDC with statewide bar counsel in this allegation. It is statewide bar counsel, not the OCDC, who decides whether or not to forward a complaint to a local grievance panel. *Compare* Conn. Prac. Bk. § 2-32(a) *with* Conn. Prac. Bk. § 2-34A.

members of the OCDC and others within the Connecticut Judicial Branch to interfere with

Miller's pursuit of racial discrimination claims. (*Id*. ¶ 41.)

### b. Referral from Judge Bellis

Miller alleges that, also on November 3, 2015, Bowler and the SGC "filed" a complaint

against Miller based on a referral by Connecticut Superior Court Judge Barbara Bellis. The

referral claimed that Miller had engaged in misconduct by refusing to make a client available for

a deposition and misusing a caseflow request in the matter of *Mazzo v. Town of Fairfield*. (TAC

¶ 56.) Miller alleges that Bowler, the SGC, and the OCDC had "irrefutable documentary

evidence" that another attorney—not Miller—was actually responsible for such misconduct. (*Id*.

¶ 57.) "Despite Bowler's knowledge that the referral on these matters was based upon false

evidence, they nevertheless found probable cause to discipline" Miller, and no action was taken

to discipline the Caucasian attorney who was actually responsible for the misconduct. [9] (*Id*. ¶¶

58-59.)

### c. *En Banc* Referral from Connecticut Appellate Court

---

[9] Although the language of this portion of the TAC states that Bowler and the SGC "filed" a
complaint against Miller, the Court construes this language to allege as follows: (1) Judge Bellis
made a referral to the SGC against Miller, (2) Bowler referred the matter to the Danbury
grievance panel, and (3) the Danbury grievance panel made a finding of probable cause. This
interpretation is supported by the parties' briefs. (*See* Defs' Br., ECF No. 34-1 at 18 ("Plaintiff's
allegations about Defendant Bowler in particular demonstrate that he processed the alleged
complaints based on the alleged referrals by the OCDC and Connecticut Superior Court only
after the Danbury local grievance panel made a finding of probable cause on those alleged
referrals." (citing TAC ¶¶ 39, 56)); Pl.'s Opp. Br., ECF No. 43 at 8 ("Disciplinary counsel's
[presumably meaning Bowler's] referral to the Danbury local [grievance] panel of alleged
misconduct referral by a superior court judge when the documents show without question that
multiple false statements had been made about Plaintiff, imputing to Plaintiff misconduct of
another attorney.").) It is also supported by the Connecticut Practice Book provisions setting
forth the respective roles and authorities of statewide bar counsel, the SGC, and the local
grievance panels. *See* Conn. Prac. Bk. §§ 2-29, 2-32, 2-33, 2-34A.

Miller alleges that the OCDC "caused a referral to be made to the local panel of the grievance committee based upon a referral by the *en banc* Connecticut Appellate Court." (*Id.* ¶ 33); *see* footnote 8, *supra*. Miller states that the Connecticut Appellate Court's action referring her to Disciplinary Counsel, "is the subject of a pending writ of error before the Connecticut Supreme Court" (*id.* ¶ 34) in which Miller alleges disparate treatment.[10] (*Id.* ¶ 35.) Miller alleges, "[u]pon information and belief," that the OCDC's referral to the local grievance panel was motivated by "animus towards her race discrimination and civil rights litigation practice" (*id.* ¶ 37) and the objective of the referral "was to create a paper trail for purposes of further disciplining [Miller] and ultimately causing the loss of her license to practice law." (*Id.* ¶ 36)

### 3.   Handling of Grievance Filings Against Other Attorneys

Miller alleges that she filed grievances against various Caucasian attorneys for false statements, and she alleges, "[u]pon information and belief," that Bowler, Sutton, and members of the SGC sought to protect those attorneys. (TAC ¶¶ 44-55.) She further alleges that they failed to investigate the grievances and found no probable cause to proceed on her complaints of misconduct against the attorneys. (*Id.*) On August 17, 2015, Miller filed grievances against Caucasian attorneys Betsy Ingraham and Nancy Brouillet (Assistant Attorney General),[11]

---

[10] While the motion to dismiss was pending, the parties notified this Court that the Connecticut Supreme Court had dismissed Miller's writ of error. (ECF No. 39; *see Miller v. Appellate Court*, 320 Conn. 759 (2016).)

[11] Miller spells this name as "Brouilett" in the TAC, but the correct spelling appears to be "Brouillet" according to the spelling in other court documents, *see, e.g., Lawrence v. Weiner*, 315 Conn. 925, 109 A.3d 921 (2015), and in the directory of employee contact information for the Connecticut Office of the Attorney General. *Employee Contact Information by Agency*, http://www.phone.ct.gov/EmpByDept.aspx?deptid=OAG. Miller alleges that on September 2, 2015, Bowler and the SGC refused to process her grievance against Attorney Brouillet. Miller insisted that it be processed. (TAC ¶¶ 50-51.)

alleging that they had made false oral and written statements, respectively. (*Id*. ¶¶ 44, 49.) On October 29, 2015, the Fairfield Grievance Panel found no probable cause to proceed on the claim against Ingraham (*id*. ¶ 48), and on December 16, 2015, the Hartford Grievance Panel found no probable cause to proceed on the claim against Brouillet. (*Id*. ¶ 52.) Miller also alleges that one of her clients filed a grievance against Caucasian attorney Thomas Rome, claiming that he failed to account for approximately $29,000 in funds that had been ordered returned to her client. (*Id*. ¶ 61.) Miller alleges that, "[u]pon information and belief," Bowler and the SGC did not require Rome to provide the client with any evidence that Rome held the funds and sought to insulate Rome from the consequences of his misconduct because he is Caucasian. (*Id*. ¶¶ 61-62.) Miller also alleges that "Bowler and the SGC [have] engaged in application of the attorney discipline rules and regulations in a manner that discriminates against African-American attorneys while insulating Caucasian attorneys particularly when the grievance is made by an African-American against said Caucasian attorneys." (TAC ¶ 55.)

### 4.  Relief Requested

Other than costs and attorneys' fees, the only relief specifically requested in the TAC is injunctive. The TAC seeks to enjoin Defendants from pursuing: (1) "any claim of the additional allegations of professional misconduct in any grievance hearing or other manner"; (2) "any reprimand, suspension or other sanction against Plaintiff for the additional allegations of professional misconduct"; and (3) "any claim of professional misconduct for filing claims of racial discrimination or other civil rights claims on behalf of Plaintiff's clients." (TAC at 17.)

### C.  Supplemental Materials Filed by Miller

Before filing her brief in opposition to Defendants' motion to dismiss the TAC, Miller filed an affidavit (ECF No. 40) along with exhibits (ECF Nos. 41, 42) alleging additional

incidents of disparate treatment, including many by non-parties. After the motion to dismiss was fully briefed, Miller filed two additional motions to supplement the record. (ECF Nos. 48, 49). The first motion to supplement the record states that, on July 10, 2015, Miller filed a complaint of discrimination with the Connecticut Commission on Human Rights & Opportunities ("CHRO") against the Connecticut Judicial Branch and the OCDC.[12] (ECF No. 48 at 1.) "On June 1, 2016 after an initial merit assessment requiring the matter to be held for full investigation, the agency abruptly changed course and issued a letter dismissing the complaint and with no explanation whatsoever." (*Id.*)

Miller's affidavit (ECF No. 40) repeats many of the allegations from the TAC, and Miller's second motion to supplement the record (ECF No. 49) also repeats factual allegations from Miller's affidavit. To the extent they allege facts that have not been previously alleged, such facts are described below.

### 1. Allegations of Disparate Treatment by the OCDC

Miller alleges that another African-American attorney, Joseph Elder, was subject to disparate treatment by the OCDC when it pursued an eleven-year-old matter "that was not the subject of a grievance" against him, resulting in his suspension from the practice of law for one year. (ECF No. 40 ¶ 30.)

Miller also elaborated on her allegations that she was treated unfairly by the OCDC compared to Caucasian attorneys. On June 22, 2015, Sutton wrote Miller an e-mail suggesting that the OCDC was seeking to suspend Miller for her conduct stemming from Judge Meyer's referral. Sutton wrote:

---

[12] This motion is incomplete (it is cut off in mid-sentence), unsigned, and lacks a certificate of service. (ECF No. 48.)

I just had a case that dealt with repeated and continuous unsupported pleadings. I have attached the decision. Since you do not have the same grievance history as Mr. Rozbicki I would not ***seek such a lengthy suspension*** [of four years]. However, I do think your conduct is a matter to be decided by the superior court not the grievance committee. We can make an agreement pursuant to Practice Book Section 2-82(c)(i) and leave the matter up to the Court.

(ECF No. 40 ¶ 9 (emphasis in original).) Miller had no prior grievance history at that time, while Rozbicki had three prior suspensions in 1992, 2013 and 2015; five presentments in 1987, 2010 and 2013; and a reprimand in 2006. (*Id*.) Miller responded to Sutton by e-mail on June 23, stating that she found "it absolutely absurd to suggest that the two cases are in the least bit similar." (*Id*.) Miller further alleges that, leading up to the grievance hearing on the matter, Carrasquilla continued to threaten suspension by seeking Miller's "agreement to accept a suspension," which Miller "found to be absolutely draconian given the simple pleading allegation deemed to be false." (*Id*.) Miller's affidavit also alleges, "[u]pon information and belief, [that] by making a referral to the local grievance panel against me regarding the two cases that are not the subject of any grievance [*Igidi* and *Eaddy*] the OCDC intends to seek a basis for suspension of my license to practice" law. (ECF No. 40 ¶ 31.) Finally, during a June 9, 2016 hearing before a grievance panel, Miller alleges that Carrasquilla sought a presentment against Miller because of Miller's "attitude" in facing charges that she improperly dealt with $200,000 that had been given to her by a church acquaintance. (ECF No. 49 at 2). Miller alleges that Carrasquilla did not think that Miller was taking the matter seriously because Miller "expressed being peeved at what appears to be an attempt to manufacture evidence for discipline." (*Id*.) Miller further alleges that "[t]here is no known basis under the disciplinary rules for 'attitude' to be placed on trial." (*Id*.).

Miller also alleges that the OCDC does not seek to discipline Caucasian attorneys as harshly as it has sought to discipline her. She cites a "recently[-]proposed resolution of a

grievance against attorneys in two law firms that would have required only a reprimand but no repayment of several million dollars in derogation of a contingency agreement and $635,000 in undocumented costs." (ECF No. 40 ¶ 9 (citing *D'Attilo v. Connecticut Statewide Grievance Committee, Office of Chief Disciplinary Counsel. Michael Bowler, Karyl Carrasquilla, et al.*; HHD-CV16-6065012-S).) During the June 9, 2016 hearing before a grievance panel, a panelist interrupted Miller when she sought to mention that attorneys from Koskoff, Koskoff & Bieder allegedly took more than $4 million dollars from their clients, "yet Defendants have not sought suspension of their licenses nor has there been any presentment against them." (ECF No. 49 at 2.) And although Attorney Kristan Peters-Hamlin was suspended from practice for seven years in the state court of New York and the U.S. District Courts of Connecticut and the Southern District of New York, the OCDC "took no action to seek reciprocal discipline of Peters-Hamlin until January 15, 2015, *seven years after the fact*." (ECF No. 49 at 1-2 (emphasis in original).) Miller attached documents relating to Peters-Hamlin's disciplinary proceedings, including a Second Amended Application for Reciprocal Discipline Pursuant to Practice Book § 2-39 and the Revised Memorandum of Decision in *Disciplinary Counsel v. Peters-Hamlin*, No. FSTCV156024364S (Conn. Super. Ct. May 26, 2015), which are described in more detail in Part III.B.5, *infra*.

### 2.    Alleged Disparate Treatment by Judicial Branch

Miller's supplemental materials cite multiple allegations against non-parties, including Connecticut state judges, that she alleges demonstrate disparate treatment toward her, her clients, or other African American attorneys:

- In February of 2014, African American attorney, Rebecca Johnson, met with the Director of Lawyers Concerned for Other Lawyers ("LCOL") to seek assistance with her motion for reinstatement to the Connecticut bar. (ECF No. 40 ¶ 37.) Miller alleges, upon information and belief, that LCOL is an agent of the

16

Connecticut Judicial Branch. (*Id.* ¶ 38.) "The Director of LCOL advised Johnson that if she were reinstated" she should "never again practice" in the area of civil rights law, and should avoid having anything to do with Miller. (*Id.* ¶¶ 39-40.) "Upon information and belief, the statements of the LCOL Director confirm that animus exists against African-American lawyers who practice civil rights law." (*Id.* ¶ 41.)

- Miller also filed a motion for sanctions against Brouillet with a trial judge. Miller alleges that, "[t]o date, the judge has failed to take any action on the motion for sanctions." (*Id.* ¶ 68.)

- Miller timely filed appeal documents in one of her cases, but "the matter was not docketed for some two months until after [Miller] intervened to claim that [her] client's due process rights were being violated." (*Id.* ¶ 78.)

- While the losing party in one of Miller's cases was permitted to file a notice of appeal five months late and without any of the required supporting documents, one of Miller's timely-filed appeals "was dismissed essentially because of a problem with the address and telephone number" of Miller's client. (*Id.*)

- A trial judge refused to grant a continuance of a trial, despite Miller's serious health condition, and proceeded with trial without Miller. (*Id.*)

- Judge Bellis ordered Miller to be in court on a day and time that Judge Bellis knew that Miller was scheduled for a court-ordered deposition in a federal case, and Judge Bellis denied Miller's request for a continuance. (*Id.*) "Upon information and belief, this was an attempt to create a pretext to cause disciplinary action to be taken against [Miller]." (*Id.*)

- On multiple occasions, when Miller has sought continuances because a trial in one court prevented her from being present in the second court, trial judges denied the continuances and dismissed the complaints Miller had filed on behalf of her clients (*Id.*)

On November 13, 2015, during oral argument on Miller's writ of error in the matter of *Miller v. Appellate Court,* Miller alleges that the Connecticut Supreme Court did not disclose "that the attorney arguing for the state had very recently clerked for two of the justices who participated in the decision of the case." (ECF No. 40 ¶ 43.) Moreover, "the Chief Justice found no impediment to the OCDC engaging in a wholesale investigation of all of [Miller's] cases even based simply upon the referral by the Appellate Court even though such wholesale investigation

could result in a discriminatory examination of [Miller's] case." (*Id.*) Miller noted that, although she did not initially raise the issue of race during oral argument before the Appellate Court, she did reference her experience in Georgia during the 1970s. (*Id.* ¶ 45.) Miller "directly raise[d] the issue of disparate treatment in a reply brief" submitted to the Connecticut Supreme Court. (*Id.* ¶ 46.)

In that reply brief, Miller raised "issues of improper and possible criminal conduct by members of the Judicial Branch that included, inter alia, tampering with official state judicial website[s], and editing of official court transcripts." (*Id.*) Despite Miller's requests for investigation by the Connecticut State Police, Miller has "yet to receive a report of the outcome" of any investigation. (*Id.*) Miller's reply brief also raised other "instances of disparate treatment," including her allegation that Judge Bellis referred her for misconduct based on the conduct of another attorney. (*Id.*) In another matter, a trial judge reversed a jury verdict that had been in favor of one of Miller's clients three days after Miller had informed Judge Bellis that "it appeared that [Judge Bellis] was engaging in disparate treatment of [Miller] [by] giving advice to [an] opposing attorney in the case on how to file a motion to dismiss the case." (*Id.*) Finally, Miller filed a motion for permission "to submit a supplemental brief that directly . . . raised the issue presented by NAACP v. Button," which the Connecticut Supreme Court denied. (*Id.* ¶¶ 47-48.) Nevertheless, Miller alleges that:

> By acknowledging the allegation of possible racial motivation by the appellate court in the decision to discipline me, the [Connecticut] Supreme Court then refused to provide an avenue of redress even when it had the opportunity to do so. By failing to even address the racial motivation allegation, the Supreme Court has demonstrated that there is no avenue for me to have this constitutional claim addressed within the state court system.

(*Id.* ¶ 49.)

## II.    LEGAL STANDARD

Generally, *pro se* plaintiffs are "entitled to special solicitude," and courts must interpret their submissions "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F .3d 471, 477 (2d Cir. 2006) (internal quotation marks and citations omitted). *Pro se* attorneys, however, are generally experienced in litigation and cannot claim such "special consideration." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 82 n.4 (2d Cir. 2001) (citation and internal quotation marks omitted) *abrogated on other grounds by Gross v. FBL Fin. Servs.,* 129 S.Ct. 2343, 2350 (2009); *Tracy v. Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010) ("[T]he degree of solicitude may be lessened where the particular *pro se* litigant is experienced in litigation and familiar with the procedural setting presented. . . . [A] lawyer representing himself ordinarily receives no such solicitude at all.") (internal citations omitted). Here, Miller alleges that she has been practicing law for thirty-five years, during most of which she has "specialized in employment discrimination/civil rights law." (TAC ¶ 7.)

The Court considers issues of jurisdiction, including "the discretionary doctrines of abstention," *All. of Auto. Mfrs., Inc. v. Currey*, 984 F. Supp. 2d 32, 43 (D. Conn. 2013), before considering the motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.,* 752 F.3d 239, 243 (2d Cir. 2014) (citations and internal quotation marks omitted). Although many courts apply Fed. R. Civ. P. 12(b)(1) when analyzing *Younger* abstention, some find that dismissal based on "*Younger* abstention is appropriate under Fed. R. Civ. P. 12(b)(6) rather than Fed. R. Civ. P. 12(b)(1) when it is clear from the face of the complaint that the defense bars the plaintiff's claims as a matter of law." *JGB Properties, LLC v. Ironwood, LLC*, No. 5:14-CV-

1542 GTS/ATB, 2015 WL 1399997, at *7 (N.D.N.Y. Mar. 26, 2015) (citing *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86–87 (2d Cir. 2000)); *see Saunders v. Flanagan*, 62 F. Supp. 2d 629, 631 (D. Conn. 1999) (citing Rule 12(b)(6) as the governing legal standard and abstaining from exercising jurisdiction over plaintiff's claims for injunctive and declaratory relief under *Younger*).

Under both standards, the Court takes the facts in the complaint as true and may consider certain documents outside of the pleadings. Under Fed. R. Civ. P. 12(b)(1), "where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits. In that case, the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Tandon*, 752 F.3d at 243 (citations, quotation marks, and alterations omitted). Under Fed. R. Civ. P. 12(b)(6), the Court accepts as true all factual allegations in the complaint and draws all inferences from these allegations in the light most favorable to the plaintiff. *See Harris v. Mills*, 572 F.3d 66, 71–72 (2d Cir. 2009). In addition to the complaint, the court may consider "documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation and internal quotation marks omitted). The Court may take judicial notice of documents filed in other cases and of the public records related to Miller's SGC disciplinary proceedings. *Shakur v. Bruno*, No. 3:12CV984 SRU, 2014 WL 645028, at *1 (D. Conn. Feb. 18, 2014) ("When considering a motion to dismiss, the court may properly consider matters of which judicial notice may be taken. Judicial notice may be taken of documents filed in other cases and other courts.") (citation omitted); *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court

not for the truth of the matters asserted in the other litigation but rather to establish the fact of such litigation and related filings.") (citation omitted).

## III.   DISCUSSION

### A.   Miller's Request to Enjoin Prosecution of the "Additional Allegations" is Moot, But Her Remaining Request for Injunctive Relief Presents a Live Controversy

Defendants argue that the case is moot because the only conduct Miller is currently seeking to enjoin—the prosecution of the Additional Allegations—ceased shortly after this case was filed. Specifically, on October 30, 2015, the reviewing committee of the SGC found no violations based on the Additional Allegations of misconduct, and declined to order discipline against Miller based on those allegations. (ECF No. 34, Ex. F at 4.) And while the TAC seeks a separate injunction against the prosecution of "any claim of professional misconduct for filing claims of racial discrimination or other civil rights claims on behalf of Plaintiff's clients" (TAC at 17), Defendants argue that Miller has dropped that request in her briefing of this motion, making her only remaining requests for injunctive relief moot.

"When the issues in dispute between the parties are no longer live, a case becomes moot, and the court—whether trial, appellate, or Supreme—loses jurisdiction" over those issues. *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 84 (2d Cir. 2005) (citations and internal quotation marks omitted). "Longstanding principles of mootness . . . prevent the maintenance of suit [or claim] when there is no reasonable expectation that the wrong will be repeated. . . . [It must be] absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 66 (1987). Mootness "occurs when the parties have no legally cognizable interest or practical personal stake in the dispute." *ABN Amro Verzekeringen BV v. Geologistics Ams., Inc.*, 485 F.3d 85, 93 (2d Cir. 2007). "[D]efendants have been found to satisfy

their burden [of establishing that the challenged conduct cannot reasonably be expected to recur] by, for example, submitting a sworn affidavit disavowing any intent to ever repeat the challenged conduct." *Farez-Espinoza v. Napolitano*, No. 08 CIV. 11060HB, 2009 WL 1118098, at *4 (S.D.N.Y. Apr. 27, 2009) (citations omitted).

Miller's first two claims for relief seek to enjoin Defendants from pursuing the Additional Allegations of professional misconduct. As noted, those Additional Allegations have been dismissed. Further, the Defendants have represented to this Court that "discipline is no longer being sought against Plaintiff based on those allegations" (ECF No. 34 at 12)—a statement on which the Court relies in part in making its determination of mootness. Any attempt to pursue the Additional Allegations in the future would thus likely be foreclosed by the doctrine of judicial estoppel. *DeRosa v. Nat'l Envelope Corp.,* 595 F.3d 99, 103 (2d Cir. 2010) ("Typically, judicial estoppel will apply if: 1) a party's later position is clearly inconsistent with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel. We further limit judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity is certain.") (internal quotation marks and citations omitted).

Miller's third claim for relief broadly seeks to enjoin Defendants from pursuing any claim of professional misconduct against Miller for filing civil rights claims on behalf of Miller's clients. Her brief in opposition to Defendants' motion to dismiss states three times that her requests for injunctive relief are limited to the proceedings involving the Additional Allegations. (*See* ECF No. 43 at 1 ("It is clear from the remedies section of the complaint for injunction that [it] is solely the '***additional allegations***' of professional misconduct that is sought to be

enjoined." (emphasis in original)); *id.* at 4 ("The plain reading of Plaintiff's complaint for injunction is that it is direct[ed] only to the '***additional allegations***' of professional misconduct . . . ." (emphasis in original)); *id.* at 6 ("[T]he remedy sought is regarding only the 'additional allegations' of misconduct.").)

Read in context, however, these assertions appear to be aimed at distinguishing Miller's challenge to the Additional Allegations from the original referral by Judge Meyer, which Miller stresses she is not contesting in this lawsuit. (ECF No. 43 at 2 ("The Complaint Does Not Seek to Enjoin Any Judicial Referrals Made by the Federal District Court Judge. . . . It is clear from the remedies section of the complaint for injunction that [it] is solely the '***additional allegations***' of professional misconduct that is sought to be enjoined. The referral by Judge Meyer was based upon a discrete finding of a false statement in the pleadings . . . ." (emphasis in original)); *id.* at 4 ("The plain reading of Plaintiff's complaint for injunction is that it is direct[ed] only to the '**additional allegations**' of professional misconduct not the allegation of misconduct as originally referred by Judge Meyer." (emphasis in original)); *id.* at 6 ("[Defendants] attempt to obscure the pleadings by contending that it is the referral of Judge Meyer that Plaintiff seeks to enjoin. Nothing could be further from the truth, as the remedy sought is regarding only the 'additional allegations' of misconduct.").)

In addition, in the only portion of her brief that actually addresses the mootness issue, Miller contends that the case is not moot because of a still-pending disciplinary proceeding, apparently the one involving the two civil rights cases, *Igidi* and *Eaddy*, that she filed on behalf of her clients: "Nor has the matter been made moot by the present distance that disciplinary counsel has sought to place regarding the additional allegations of professional misconduct. A new grievance has been filed that alleges professional misconduct with regard to race

discrimination claims filed on behalf of Plaintiff's clients." (*Id*. at 20.) Miller's adds: "By its investigation of the racial discrimination lawsuits filed by Plaintiff on behalf of her clients, the OCDC is attempting to smother and suppress all such litigation by her." (*Id*.) These statements suggest both that Miller is still pressing her third request for injunctive relief—against Defendants' pursuing "any claim of professional misconduct for filing claims of racial discrimination or other civil rights claims on behalf of Plaintiff's clients"—and that that request remains a live controversy. Accordingly, the Court concludes that while Miller's first two requests for injunctive relief against prosecution of the "Additional Allegations" are moot, her third request for injunctive relief is not.

### B.  Younger Abstention

The remaining attorney discipline proceedings that Miller alleges are ongoing against her are: (1) the proceeding regarding her pleadings in *Igidi* and *Eaddy*; (2) the proceeding based on the referral by Judge Bellis; and (3) the proceeding based on a referral by the *en banc* Connecticut Appellate Court. For the reasons set forth below, however, the Court abstains from exercising jurisdiction over Miller's request to enjoin those proceedings under the doctrine of *Younger* abstention. *See Younger v. Harris*, 401 U.S. 37, 43 (1971).

*Younger* abstention "is grounded in interrelated principles of comity and federalism." *Spargo v. New York State Comm'n on Judicial Conduct*, 351 F.3d 65, 74 (2d Cir. 2003). It "is not a jurisdictional bar based on Article III requirements, but instead a prudential limitation on the court's exercise of jurisdiction grounded in equitable considerations of comity." *Id*. (citing *Diamond "D" Constr. Corp. v. McGowan,* 282 F.3d 191, 197 (2d Cir. 2002)). Younger abstention is "exceptional" and applies only to three classes of parallel proceedings: (1) ongoing state criminal prosecutions; (2) "particular state civil proceedings that are akin to criminal

prosecutions"; and (3) civil proceedings "that implicate a State's interest in enforcing the orders and judgments of its courts." *Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 588 (2013); see *id.* at 591 ("these three 'exceptional' categories . . . define Younger's scope."). Although the court may also consider "additional factors" before invoking *Younger*—including whether (1) there is a pending state proceeding, (2) that implicates an important state interest, and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of her federal constitutional claims (sometimes referred to as the "Middlesex conditions" from their origin in *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982))— the Supreme Court has made clear that Younger may extend no further than the three "exceptional" classes of parallel proceedings identified above. *Sprint*, 134 S. Ct. at 593-94.

There is no doubt that, although *Younger* abstention is "exceptional," it applies to the state disciplinary proceedings pending against Miller. *Sprint,* 134 S. Ct., at 588 (citing, with approval, application of *Younger* to state disciplinary proceedings against lawyer for violating state ethics rules in *Middlesex*); *see also Kirschner v. Klemons*, 225 F.3d 227, 230 (2d Cir. 2000) (applying *Younger* to state disciplinary proceedings involving dentist). Attorney discipline proceedings are state civil proceedings that are akin to criminal prosecutions. "Such enforcement actions are characteristically initiated to sanction the federal plaintiff, *i.e.,* the party challenging the state action, for some wrongful act." *Sprint*, 134 S. Ct. at 592 (citing *Middlesex Cty. Ethics Comm.*, 457 U.S., at 433-34). Attorney discipline proceedings commonly involve investigations by the state and "often culminat[e] in the filing of a formal complaint or charges." *Id.* (citations omitted).

The *Middlesex* conditions also support the application of *Younger* abstention here. First, "*Younger* applies 'only when state court proceedings are initiated before any proceedings of

substance on the merits have taken place in the federal court.'" *City of Hartford v. Chase*, 942 F.2d 130, 136 (2d Cir. 1991) (citing *Hawaii Housing Auth. v. Midkiff,* 467 U.S. 229, 238 (1984)). Miller filed her first complaint in this federal case on July 21, 2015. (ECF No. 1.) Although it is unclear from the TAC exactly when each of the pending disciplinary proceedings were initiated, all were initiated prior to any proceedings of substance in federal court, as no proceedings of substance have taken place yet. Since July of 2015, the Court has stayed discovery, Miller has filed three amendments to her original complaint, and the parties have briefed each of Defendants' motions to dismiss the amended complaints.

Second, the ongoing disciplinary proceedings here implicate important state interests in the regulation and oversight of the legal profession. *See Middlesex Cty. Ethics Comm.*, 457 U.S. at 433 (recognizing the important state interest in state regulation of lawyers); *Sica v. Connecticut*, 331 F. Supp. 2d 82, 84 (D. Conn. 2004) ("The licensing and discipline of physicians practicing within the state raise issues of paramount state concern.").

Third, the ongoing disciplinary proceedings afford Miller adequate opportunities to raise her federal constitutional claims. If a grievance panel determines that probable cause exists that an attorney is guilty of misconduct, the SGC—or a reviewing committee made up of at least three members of the SGC—"shall hold a hearing on the complaint." Conn. Prac. Bk. § 2-35(c). At the hearing, the respondent has the right to be heard in her own defense. *Id*. § 2-35(h). Within 30 days of the reviewing committee's final decision, the respondent may request that the SGC review the reviewing committee's final decision based on a claim that the committee's decision was in violation of constitutional provisions. *Id*. § 2-35(k). In addition, a respondent may appeal the SGC's or reviewing committee's decision imposing sanctions or conditions to the Connecticut Superior Court. *Id*. § 2-38(a). The respondent may appeal the decision of the

Superior Court to the Connecticut Appellate Court, and may then seek review in the Connecticut

Supreme Court. *See Fund v. City of New York*, No. 14 CIV. 2958 KPF, 2014 WL 2048204, at *9

(S.D.N.Y. May 19, 2014) ("The express access to the courts provided Plaintiffs in local and state

law leaves them without an argument that federal court review is necessary to safeguard their

constitutional rights."). "As the Second Circuit has found in an analogous thread of *Younger*

analysis, where such state remedies are available, a federal court should assume that state

procedures will afford an adequate remedy, in the absence of unambiguous authority to the

contrary." *Fund v. City of New York*, No. 14 CIV. 2958 KPF, 2014 WL 2048204, at *9

(S.D.N.Y. May 19, 2014) (quoting *Diamond "D"*, 282 F.3d at 202) (internal quotation marks

omitted).

In Miller's opposition brief, she argues that she has not had—and will not have—an

adequate opportunity to raise her federal constitutional claims in the state proceedings. Miller

sought to raise federal constitutional claims of disparate treatment during the September 1, 2015

grievance hearing on the referral from Judge Meyer. The Committee chair interrupted her and

said:

> This is so far [a]field, Ms. Miller, that it's really an abuse of this function to allow
> this to continue. You've made your point, we understand it. You've beaten us
> over the head with the fact that you believe in your heart of hearts that you have
> been singled out in this disciplinary process because you are an attorney who
> brings discrimination – racial discrimination claims. We get it. You don't need to
> bring up countless other examples. That's an awfully big wad of paper you have
> in front of you. And I can tell you if you want to go through every page of that,
> it's not going to happen. That's not – that's an abuse of this process, and it's not
> fair to those of us who are charged with the responsibility for maintaining the
> integrity of this process.

(ECF No. 43 at 18.) But Miller does not allege that she requested that the SGC review the

reviewing committee's final decision based on a claim that the committee's decision was in

violation of constitutional provisions, *see* Conn. Prac. Bk. § 2-35(k), or that she appealed the

reviewing committee's decision, and she does not dispute the Defendants' representation that she did not. (ECF No. 34 at 5.) Although appeals are "confined to the record," the Connecticut Practice Book specifically states that, "[i]f alleged irregularities in procedure before the statewide grievance committee or reviewing committee are not shown in the record, proof limited thereto may be taken in the court." *Id.* § 2-38(d). There is no suggestion in the record that Miller took advantage of these procedures to raise her federal constitutional claims by seeking review or appealing the decision of the reviewing committee. Her failure to utilize available remedies does not mean that she did not have an adequate opportunity to do so.[13]

Ultimately, Miller herself seems to concede that *Younger* abstention applies. Instead of arguing that the Court should not abstain under *Younger*, she argues that the Court should exercise jurisdiction over this case under two narrow exceptions to *Younger*: bad faith or

---

[13] The same is true of Miller's attempts to raise claims of racial discrimination in the matter of *Miller v. Appellate Court*, 320 Conn. 759 (2016). Miller alleges that in a reply brief in the Connecticut Supreme Court, she "cited multiple examples of disparate treatment" based on her race "including a judicial referral that resulted in a dismissal of her civil rights lawsuit when she had two trial dates conflicting." (ECF No. 43 at 11.) She also sought to file a supplemental brief on disparate treatment in attorney discipline with the Connecticut Supreme Court, but the court denied the motion to allow the supplemental brief. (*Id.* at 12.) This does not mean, as Miller suggests, that she was denied a fair *opportunity* to raise issues of race discrimination in the *Miller v. Appellate Court* matter. (*See id.*) It is a basic rule of appellate practice—indeed, litigation practice—that parties are generally not allowed to raise new issues or arguments in reply briefs. Connecticut courts follow this rule, *see, e.g., Markley v. Dep't. of Public Utility Control*, 301 Conn. 56, 74 (2011) ("We have often noted that it is improper to raise a new argument in a reply brief, because doing so deprives the opposing party of the opportunity to respond in writing." (internal quotation marks and citation omitted)), as does this Court. *See* D. Conn. L.R. 7(d) ("A reply brief . . . must be strictly confined to a discussion of matters raised by the responsive brief . . . ."). As for supplemental briefs, the Connecticut appellate rules do not even contain a provision authorizing them and thus, without obtaining the permission of the court, a party would not be authorized to file such a brief, let alone to raise new arguments in such a brief. In short, Miller failed to raise the issues of race discrimination in *Miller v. Appellate Court* properly under Connecticut's procedures—procedures that are neither unusual nor unduly restrictive. Her failure to follow those procedures does not mean that she was denied an opportunity to raise the issues.

extraordinary circumstances. *Diamond "D"*, 282 F.3d at 198 ("a federal court may nevertheless intervene in a state proceeding upon a showing of bad faith, harassment or any other unusual circumstance that would call for equitable relief."). These two exceptions are "tightly defined." *Id.; Saunders*, 62 F. Supp. 2d at 634 ("These exceptions . . . represent a 'very narrow gate for federal intervention in pending state criminal proceedings.'") (quoting *Arkebauer v. Kiley*, 985 F.2d 1351, 1358 (7th Cir. 1993)). The exceptions apply "[o]nly in cases of *proven* harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction and perhaps in other extraordinary circumstances." *Perez v. Ledesma*, 401 U.S. 82, 85, 91 S. Ct. 674, 677, 27 L. Ed. 2d 701 (1971) (citations omitted) (emphasis added). As the plaintiff, Miller "bears the burden of establishing that one of the exceptions applies." *Diamond "D"*, 282 F.3d at 198.

### 1. Bad Faith

"[F]or a federal plaintiff to invoke the bad faith exception, the party bringing the state action must have no reasonable expectation of obtaining a favorable outcome," such as where a "proceeding has been brought to retaliate for or to deter constitutionally protected conduct, or where a . . . proceeding is otherwise brought in bad faith or for the purpose to harass." *Diamond "D"*, 282 F.3d at 199 (internal citations and quotation marks omitted).

> [T]he subjective motivation of the state authority in bringing the proceeding is critical to, if not determinative of, this inquiry. A state proceeding that is legitimate in its purposes, but unconstitutional in its execution—even when the violations of constitutional rights are egregious—will not warrant the application of the bad faith exception. To invoke this exception, the federal plaintiff must show that the state proceeding was initiated with and is animated by a retaliatory, harassing, or other illegitimate motive.

*Id.*

The TAC fails to allege specific facts showing that the three pending disciplinary proceedings—based on (1) the referral of the racial discrimination cases (*Igidi* and *Eaddy*); (2)

the referral from Judge Bellis; and (3) the *en banc* referral from the Connecticut Appellate Court—were initiated with and animated by retaliatory, harassing, personal animus or other illegitimate motives. The allegations in the TAC regarding Defendants' motivations or purposes are conclusory and are virtually all made "upon information and belief":

- "Upon information and belief, defendants' intent and purpose [in bringing disciplinary proceedings against Miller] is to restrain [Miller] in the exercise not only of her own right to make a claim that her civil rights have been violated based upon racial discrimination, but also to hold a Sword of Damocles over her head with respect to bringing claims of racial discrimination on behalf of her clients in general." (TAC ¶ 19);

- "Upon information and belief," the OCDC does "not intend to undertake any investigation of the substantial evidence of attorney misconduct substantially similar to that alleged against" Miller [that Miller claims to have submitted to the OCDC]. (*Id*. ¶ 23);

- the "purpose of the referral [by the OCDC of the *Igidi* and *Eaddy* cases] to the local grievance committee panel was to cause a finding of probable cause against Plaintiff and to discipline her for said handling of these racial discrimination claims." (*Id*. ¶ 31)

- "Upon information and belief," the purpose of the OCDC's referral to a local grievance panel of the Connecticut Appellate Court's [*en banc*] referral "was to create a paper trail for purposes of further disciplining [Miller] and ultimately causing the loss of her license to practice law." (*Id*. ¶ 36);

- "Upon information and belief, the OCDC is motivated to discipline [Miller] . . . because of its animus towards her race discrimination and civil rights litigation practice." (*Id*. ¶ 37);

- "Upon information and belief," Bowler, the OCDC, "and others within the Connecticut Judicial Branch" acted "to interfere with [Miller's] pursuit of racial discrimination complaints on behalf of her clients." (*Id*. ¶ 41);

- "Upon information and belief," Bowler and the SGC "singled out" Miller's racial discrimination complaints for investigation, "rather than other types of civil rights complaints being pursued by [Miller] on behalf of clients." (*Id*. ¶ 42);

- "Upon information and belief Bowler and SGC singled out racial discrimination complaints filed against agencies of the State of Connecticut in an unlawful attempt to subvert legitimate causes of actions." (*Id*. ¶ 43);

- "Upon information and belief Bowler and members of the SGC, through its Fairfield Judicial District Grievance Panel, sought to foreclose Plaintiff from responding to the answer filed on behalf of Attorney Ingraham by stating that no response could be filed by any party." (*Id*. ¶ 45);

- "Upon information and belief Bowler and members of the SGC, through its Fairfield Judicial District Grievance Panel, sought to insulate Attorney Ingraham from any consequence for her false statements." (*Id*. ¶ 46);

- "Upon information and belief Bowler and members of the SGC, through its Fairfield Judicial District Grievance Panel, sought to insulate Attorney Ingraham from any consequence for her misconduct because she is Caucasian." (*Id*. ¶ 47);

- "Upon information and belief Bowler and members of the SGC, through its Hartford Judicial District Grievance Panel, sought to insulate Attorney Brouilett from any consequence for her false and misleading pleadings." (*Id*. ¶ 53);

- "Upon information and belief Bowler and members of the SGC, through its Hartford Judicial District Grievance Panel, sought to insulate Attorney Brouilett from any consequence for her misconduct because she is Caucasian." (*Id*. ¶ 54);

- "Upon information and belief, Bowler has taken no action to discipline the Caucasian attorney who was actually the subject of the conduct referred to by Judge Bellis." (*Id*. ¶ 59);

- "Upon information and belief Bowler and the SGC, acting through its Hartford Judicial District Grievance Panel, refused to find probable cause when a grievance was filed against Attorney Thomas Rome." (*Id*. ¶ 60);

- "Upon information and belief, Attorney Rome was not required by Bowler and the SGC or its agent the Hartford Judicial District Grievance Panel to provide the client with any evidence that the funds were held by Attorney Rome." (*Id*. ¶ 61[14]);

- "Upon information and belief Bowler and members of the SGC, through its Hartford Judicial District Grievance Panel, sought to insulate Attorney Rome from any consequence for his misconduct because he is Caucasian." (*Id*. ¶ 62); and

- "Upon information and belief, Bowler and the SGC, acting in concert with the Office of Chief Disciplinary Counsel and others within the Connecticut Judicial Branch, have found probable cause and pursued disciplinary proceedings against Plaintiff when Caucasian attorneys have not been disciplined or referred for discipline. By doing so they have engaged in racial discrimination." (*Id*. ¶ 64)

---

[14] This is the second paragraph labeled as "61" in the TAC.

To be sure, pleading on "information and belief" is allowed as to matters that are peculiarly within the defendants' knowledge, but the complaint must still plead some specific facts that would permit the Court to draw an inference that the disciplinary proceedings were brought against her in bad faith. The TAC does not; its allegations are "either conclusory in nature or offered on information and belief, without facts or supporting documentation sufficient to render the claim[s] plausible." *Schorr v. Prudenti*, No. 15 CIV. 4054, 2016 WL 1070850, at *4 (S.D.N.Y. Mar. 15, 2016) (citation and footnote omitted).

Further, the allegations of improper motives are implausible, and do not suggest that the Defendants are pursuing disciplinary proceedings against Miller with "no reasonable expectation of obtaining a favorable outcome" or "for the purpose to harass." *Diamond "D"*, 282 F.3d at 199. (internal quotation marks and citations omitted). Like the original referral by Judge Meyer, two of Miller's three pending disciplinary proceedings were initiated by referrals to the SGC by judges (the Connecticut Appellate Court and Judge Bellis of the Connecticut Superior Court)—a referral source that neither the SGC nor the OCDC could reasonably be expected to ignore. Further, the Defendants themselves allegedly referred *all three* of the pending proceedings to local grievance panels comprised of attorneys and non-attorneys who are not defendants in this case and who are, by design, independent of the SGC, statewide bar counsel, and the OCDC. (*See* TAC ¶¶ 56-58 (referral from Judge Bellis and finding of probable cause by local panel); ¶¶ 29-32, 39 (finding of probable cause by local panel in *Eaddy* and *Igidi* cases); and ¶¶ 33-36 (referral to local grievance panel following referral by the Appellate Court); *see also* footnote 9, *supra*; Conn. Pk. Bk. Sec. 2-29 (providing for appointment by judges of Superior Court of attorneys and non-attorneys to local grievance panels for limited terms).) Finally, for two of the three proceedings, the local grievance panels made findings of probable cause—effectively

vindicating the initiation of those investigations; in the third case, the referral from the Appellate

Court, the TAC does not allege whether the local grievance panel has or has not made a probable

cause finding yet. But there is no dispute that the referral from the Appellate Court was based on

the Appellate Court's decision to issue sanctions and suspend Miller from practicing before the

Appellate Court for six months due to her handling of several cases before that court. As noted,

the Connecticut Supreme Court recently affirmed that decision. *See Miller*, 320 Conn. at 770. All

of this makes Miller's conclusory claims of bad faith implausible.

Even Miller's allegation that Bowler, the SGC, and the OCDC had "irrefutable

documentary evidence that the attorney implicated in the documents used in support of Judge

Bellis' referral . . . was not [Miller] but rather another attorney in the case" (TAC ¶ 57) does not

support application of the bad faith exception. Even when accepted as true, the allegation, when

taken in the context of the other allegations in the TAC, does not suggest the Defendants acted

out of "retaliatory, harassing, or other illegitimate motive." The TAC alleges that the complaint

was initiated by Judge Bellis, who allegedly referred Miller for discipline despite the fact that the

"documents used in support of" the referral "implicated" another attorney, rather than Miller,

which suggests either that Judge Bellis made a mistake or that the "documents" do not tell the

whole story about Judge Bellis's reasons for making a referral for discipline. After receiving the

referral from Judge Bellis, the Defendants allegedly forwarded it to a local grievance panel for

investigation. *See* footnotes 8 and 9, *supra*. This is not suggestive of bad faith: if the referral was

contradicted by the underlying documents, sending it to the local grievance panel to sort out this

apparent discrepancy was not an unreasonable step—and plainly not evidence of bad faith.

Third, the grievance panel members, who are not defendants, found it to be supported by

probable cause, which suggests either that Judge Bellis did not make a mistake or that the

documents "implicat[ing]" another attorney did not preclude finding probable cause against Miller. The Defendants' actions in forwarding a complaint initiated by a judge and later found to be supported by probable cause by an independent group of attorneys and non-attorneys do not suggest an improper motive.

Miller's allegations concerning the third pending disciplinary proceeding, arising from the OCDC's and Sutton's investigations of two of Miller's racial discrimination cases, *Igidi* and *Eaddy*, similarly do not suggest that the Defendants acted in bad faith. (*Id.* ¶¶ 28-30.) On November 3, 2015, the Danbury local grievance panel—none of whose members are defendants in this case—found probable cause that Miller had engaged in misconduct with respect to those cases. (*Id.* ¶ 39.) Although this investigation was initiated by the OCDC (*but see* footnote 8, *supra*), the local grievance panel effectively approved it, finding that it was supported by probable cause.[15] Under the applicable rules, once the local grievance panel finds probable cause, the SGC *must* "hold a hearing on the complaint" Conn. Prac. Bk. §§ 2-35(c), and the OCDC *must* "pursue such matter before the [SGC] or reviewing committee" at the hearing. *Id.* § 2-34A(b)(1). This procedural history belies the notion that the proceeding involving the *Igidi* and *Eaddy* cases was a "prosecution[] undertaken by state officials in bad faith without hope of obtaining a valid conviction" or that Defendants "ha[d] no reasonable expectation of obtaining a favorable outcome." *Diamond "D"*, 282 F.3d at 198-99 (citations and internal quotation marks omitted).

Miller also attempts to show bad faith by alleging selective prosecution. It is unclear that claims of selective prosecution—even when adequately alleged—are sufficient to establish that

---

[15] At times, Miller appears to suggest that Defendant Bowler may have influenced the local grievance panels, but she does not allege any specific contacts, communications, or other basis to support this speculation.

the narrow bad faith exception to *Younger* applies. *Thompson v. Florida Bar*, 526 F. Supp. 2d 1264, 1279 (S.D. Fla. 2007) (citing cases). Even if they are, however, Miller's claims of selective prosecution/discrimination are not supported by factual allegations. *See Carbone v. Zollar*, 845 F. Supp. 534, 538 (N.D. Ill. 1993) ("claim of bad faith must be supported with specific allegations from which we may infer that defendants knowingly instituted meritless prosecutions . . . frivolous disciplinary proceedings . . . solely to discourage exercise of protected rights."). A claim of selective prosecution requires that Miller show that similarly situated attorneys were treated differently. *Thompson,* 526 F. Supp. 2d at 1280; *United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000) (defining a "'similarly situated' person for selective prosecution purposes as one who engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant . . . and against whom the evidence was as strong or stronger than that against the defendant."). Miller fails to allege facts showing that the Defendants treated her differently from similarly situated attorneys.

Miller alleges that she and her clients filed grievances against various Caucasian attorneys, and that "Bowler and the SGC . . . engaged in application of the attorney discipline rules and regulations in a manner that discriminates against African-American attorneys while insulating Caucasian attorneys particularly when the grievance is made by an African-American against said Caucasian attorneys." (TAC ¶ 55.) On August 17, 2015, Miller filed grievances against Attorney Betsy Ingraham and Assistant Attorney General Nancy Brouillet for making false statements, orally and in writing, respectively. (*Id*. ¶¶ 24, 44, 49.) In addition, one of Miller's clients filed a grievance against Attorney Thomas Rome for failure to account for approximately $29,000 in funds. (*Id*. ¶ 61.) Miller alleges that Bowler and members of the SGC "sought to insulate" attorneys Brouillet, Ingraham, and Rome from complaints of misconduct

because they are Caucasian. (*Id.* ¶ 46-47, 53-54, 62.) These conclusory allegations, however, are not supported by the facts alleged in the TAC. The TAC suggests that Ingraham, Brouillet, and Rome's grievances went through the same procedures as the grievances against Miller, and all were referred to grievance panels independent of the Defendants.[16] Although several panels found probable cause to proceed against Miller, other panels did not find probable cause to proceed against Brouillet, Ingraham, and Rome. (TAC ¶¶ 47-48, 52-54, 60-63.) Thus, to the extent these attorneys were treated differently from Miller, this was apparently a result of decisions reached by independent groups—not Defendants—as to the merits of the complaints against those attorneys. It is also worth noting that while most of the complaints against Miller were initiated by judges presiding over her cases, the complaints against attorneys Ingraham and Brouillet were initiated by Miller, a litigation adversary. Further, the complaint against Rome by Miller's client concerning financial matters is not similar to the proceedings against Miller at issue in this case. In short, the allegations in the TAC are insufficient to invoke the bad faith exception.[17]

---

[16] Miller alleges that on September 2, 2015, Bowler and the SGC "refused to process the grievance" that Miller filed against Brouillet, and Miller insisted that they do so. (ECF No. 36 ¶¶ 50-51.) There is no allegation that Bowler and the SGC failed "to process" Miller's grievance after that date. The grievance was sent to a grievance panel, which found no probable cause to proceed with the grievance on December 16, 2015. (*Id.* ¶ 52.)

[17] Miller's claim that Defendants singled out her civil rights practice—as opposed to other facets of her practice—to "chill" her from bringing civil rights cases fares no better. This claim focuses on two cases that are the subject of one of her pending disciplinary proceedings—the *Eaddy* and *Igidi* cases—both of which are allegedly racial discrimination cases. (TAC ¶ 32; ECF No. 43 at 6-7). It is not surprising that one of the pending disciplinary proceedings against Miller focuses on civil rights cases, because Miller alleges that she "specialize[s] in employment discrimination/civil rights law." (TAC ¶ 7.) Presumably, then, any of her work Defendants might have chosen to investigate would be likely to involve "employment discrimination/civil rights" cases. Indeed, Judge Meyer's original referral to the SGC—which Miller repeatedly says she is not challenging in this lawsuit—also concerned a civil rights case.

Miller also suggests that it was bad faith for disciplinary counsel to fail to withdraw the "Additional Allegations." (ECF No. 43 at 7-8.) The OCDC, however, has express authority to file additional allegations. Conn. Prac. Bk. § 2-35(d); *see also id*. § 2-32(a). Moreover, at the September 1, 2015 hearing, Carrasquilla said that she did not think she had proved the first of the two Additional Allegations by the requisite standard of clear and convincing evidence, not that she had lacked a reasonable basis to make them. Finally, the fact that Carrasquilla did not formally withdraw the Additional Allegations after stating that she did not think she had proved one of them does not mean that she acted in bad faith, any more than it would be bad faith for a lawyer to acknowledge in closing argument to a jury that he probably had not proved one of his client's claims without filing an amended complaint dropping that claim. The Court will not conclude that a lawyer's candor about the merits of the claims she has made should be a basis for finding bad faith. Finally, although the reviewing committee ultimately did not sustain the Additional Allegations, it did not suggest that they were frivolous.

## 2.  Extraordinary Circumstances

Extraordinary circumstances are those that create a "sufficient threat of such great, immediate, and irreparable injury as to warrant intervention in state . . . proceedings. . . . [S]uch circumstances must be 'extraordinary' in the sense of creating an extraordinarily pressing need for immediate federal equitable relief, not merely in the sense of presenting a highly unusual factual situation." *Diamond "D"*, 282 F.3d at 201 (quoting *Kugler v. Helfant*, 421 U.S. 117, 124-25 (1975)). The Second Circuit has determined that there are "two predicates for application of this exception: (1) that there be no state remedy available to meaningfully, timely, and adequately remedy the alleged constitutional violation; *and* (2) that a finding be made that the

litigant will suffer 'great and immediate' harm if the federal court does not intervene." *Id.*
(citation omitted) (emphasis in original).

> Only twice has the Supreme Court provided examples of circumstances that
> would meet this high standard: first, when a state statute is flagrantly and patently
> violative of express constitutional prohibitions in every clause, sentence and
> paragraph, and in whatever manner and against whomever an effort might be
> made to apply it, and later, when the state administrative agency was incompetent
> by reason of bias to adjudicate issues pending before it.

*Id.* (internal quotation marks and citations omitted).

Miller does not suggest that the attorney discipline provisions flagrantly violate
constitutional law. She does argue that Defendants are biased, she will "suffer irreparable harm"
if the disciplinary proceedings are not enjoined, and she has no remedy for the alleged
constitutional violations against her. (TAC at 13-16; ECF No. 43 at 12.) Miller has not met her
burden of alleging sufficient facts to show "extraordinary circumstances."

First, Miller's allegations of bias and bad faith, as described in Part III.B.1, *supra*, are
bare and conclusory. Second, Miller will not suffer irreparable harm; she has yet to be
disciplined in any of the three pending proceedings.[18] *See 333 E. 60th St., Inc. v. New York State
Liquor Auth.*, No. 08 CIV. 4147 (RJS), 2008 WL 4104012, at *5 (S.D.N.Y. Aug. 29, 2008)
("Nor has Plaintiff shown that it will suffer 'great and immediate' harm in the absence of federal
intervention because the results of the revocation proceeding are not yet known-it may well be
that the proceedings . . . will result in a determination favorable to Plaintiff."). And even if the
pending disciplinary proceedings result in discipline, as discussed above with respect to the third
*Middlesex* condition (Part III.B., *supra*), Miller may seek relief for the alleged constitutional

---

[18] The reviewing committee of the SGC reprimanded Miller on the Judge Meyer referral, which is
no longer pending, and Miller's opposition brief stresses that she is not challenging the proceeding
based on the Judge Meyer referral.

violations through the state review and appeal process. *See e.g., Notopoulos v. Statewide Grievance Comm.*, 277 Conn. 218, 890 A.2d 509 (2006) (reviewing attorney's claim that SGC's actions violated his rights under the First and Fourteenth Amendments to the United States Constitution). "[W]here such state remedies are available, 'a federal court should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary.'" *Diamond "D"*, 282 F.3d at 202 (quoting *Pennzoil v. Texaco,* 481 U.S. 1, 15, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987)). Because the state process can provide meaningful, timely, and adequate remedies for Miller's constitutional claims, and Miller will not suffer great and immediate harm if this Court abstains from jurisdiction under *Younger*, the Court finds that the exception for extraordinary circumstances does not apply.

### 3.   The Allegations in Miller's Supplemental Materials Do Not Warrant Exercising Jurisdiction Here

The allegations in Miller's supplemental filings about the conduct of members of the Connecticut Judicial Branch and other parties who are not defendants in this case are irrelevant to the determinations of whether the exceptions for bad faith and extraordinary circumstances apply. Below, the Court addresses Miller's additional allegations of bad faith and discrimination by the OCDC.

Miller alleges that another African-American attorney, Joseph Elder, was subject to disparate treatment by the OCDC when it pursued an eleven-year-old matter "that was not the subject of a grievance" against him, resulting in his suspension from the practice of law for one year. (ECF No. 40 ¶ 30.) The fact that another African American attorney received discipline in an unrelated matter does not suggest that Defendants exhibited bad faith or discriminatory animus in the disciplinary proceedings against Miller.

On June 22, 2015, Sutton wrote Miller an e-mail suggesting that the OCDC was seeking to suspend Miller for her conduct stemming from Judge Meyer's referral. (ECF No. 49 at 1.) Miller alleges that Sutton inappropriately compared Miller to an attorney "who was suspended for four years" (*id.*) and who had three prior suspensions in 1992, 2013 and 2015; five presentments in 1987, 2010 and 2013; and a reprimand in 2006. (ECF No. 40 ¶ 9.) Miller further alleges that, leading up to the grievance hearing on the referral by Judge Meyer, Carrasquilla continued to threaten suspension by seeking Miller's "agreement to accept a suspension." (*Id.*) Miller does not allege, however, that Sutton or the OCDC ever formally recommended a suspension for Miller, and the grievance proceeding on the Judge Meyer referral ultimately resulted in Miller receiving a reprimand. The fact that disciplinary counsel might have at one time contemplated seeking a suspension for attorney misconduct is not evidence of bad faith, because, especially in the case of the Judge Meyer referral, which Miller does not challenge at all, Miller cannot show that the Defendants "had no reasonable expectation of obtaining a favorable outcome."

During a June 9, 2016 hearing before a grievance panel, Miller alleges that Carrasquilla sought a presentment against Miller because of Miller's "attitude" in facing charges that she improperly dealt with $200,000 that had been given to her by a church acquaintance. Miller alleges that Carrasquilla did not think that Miller was taking the matter seriously because Miller "expressed being peeved at what appears to be an attempt to manufacture evidence for discipline." (*Id.*) Miller further alleges that "[t]here is no known basis under the disciplinary rules for 'attitude' to be placed on trial." (*Id.*). These allegations are vague, but in any event, Miller fails to allege facts showing that other lawyers who displayed "attitudes" similar to Miller's were treated differently, or that the disciplinary charge itself lacked merit. Miller alleges that at the

40

same grievance hearing, a member of a grievance panel interrupted Miller when she was speaking about how she was being treated differently than attorneys who had been accused of taking $4 million of their clients' funds. (*Id.* at 2.) Miller also cites a "recently[-]proposed resolution of a grievance against attorneys in two law firms that would have required only a reprimand but no repayment of several million dollars in derogation of a contingency agreement and $635,000 in undocumented costs." (ECF No. 40 ¶ 9 (citing *D'Attillo v. Connecticut Statewide Grievance Committee, Office of Chief Disciplinary Counsel. Michael Bowler, Karyl Carrasquilla, et al.*; HHD-CV16-6065012-S).)

Miller has not alleged sufficient facts regarding how such attorneys are similarly situated to her. Even if other attorneys engaged in conduct similar to Miller, and Defendants did not seek to discipline them in the same manner, the Court cannot conclude that Defendants engaged in bad faith absent factual allegations that Defendants were aware of the conduct of the other attorneys and sought to discipline Miller without a reasonable expectation of a favorable outcome. Thus, none of Miller's additional allegations about the OCDC, even if true, are sufficient to suggest that Defendants intentionally discriminated against Miller based on her race or the types of cases she handles.

*     *     *

The Court acknowledges the seriousness of Miller's allegations. Nevertheless, Miller has failed to meet her burden of alleging sufficient facts to suggest bad faith or extraordinary circumstances. Miller does not allege facts that suggest that Defendants had no reasonable expectation of obtaining a favorable outcome in each of the three pending disciplinary proceedings. Moreover, Miller's allegations of bad faith and bias are conclusory, and lack "factual content that allows the court to draw the reasonable inference that the defendant[s] [are]

liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Finally, Miller

has failed to sufficiently allege that she will suffer irreparable harm or that the state courts cannot

provide adequate and timely remedies for her constitutional claims. Thus, the Court must abstain

from jurisdiction under *Younger*.

### 4.   Miller's Requests for an Evidentiary Hearing

> [W]hen *Younger* abstention is raised on a motion to dismiss, the court is not
> required to accept the plaintiff's allegations as true and may resolve factual
> disputes. If there is a question of fact as to whether a defendant acted in bad faith,
> then an evidentiary hearing is required. However, when the complaint fails to
> allege any evidence of bad faith or if it does so only in the most conclusory
> manner, a court can decide whether to invoke the bad faith exception to *Younger*
> abstention on the basis of the complaint alone.

*Wilson v. Emond*, No. 3:08 CV 1399 (MRK), 2009 WL 1491511, at *2 (internal citations

omitted). "[I]ssues such as subjective bad faith and bias . . . are questions of fact that are often

difficult to resolve without an evidentiary hearing," *Sica*, 331 F. Supp. 2d at 87, and when there

are factual disputes about whether a *Younger* exception applies, the district court should hold an

evidentiary hearing. *Kern v. Clark*, 331 F.3d 9, 12 (2d Cir. 2003). However, "[i]n order to invoke

one of the exceptions to the *Younger* doctrine, the [person invoking the exception] must make

sufficient specific factual allegations which support an inference that the particular exception

applies and cannot rely on general claims of misconduct. Absent such allegations, the district

court is not required to conduct a hearing." *Saunders*, 62 F. Supp. 2d at 634.

Even accepted as true, the factual averments Miller made in the TAC and submitted in

her affidavit and supplemental filings are not sufficient to suggest that Defendants acted out of

animus toward her because of her race or her bringing of civil rights claims, let alone that they

had no reasonable expectation of a favorable outcome in pursuing disciplinary proceedings

against her. As discussed above, in Part III.B.1, *supra*, Miller's allegations—including

allegations that she is being targeted for disciplinary action because of her race and the types of cases she brings—"are not specific enough to support an inference of bad faith or even to require an evidentiary hearing. The allegations against the [D]efendants are general in nature and those which could be interpreted as asserting bad faith are made on 'information and belief' . . . ." *Saunders*, 62 F. Supp. 2d at 636. Moreover, the facts that Miller pleads about the procedural histories of the pending disciplinary proceedings show that two of them were initiated by third parties (*i.e.*, judges) and that all three have included or will include independent reviews for probable cause by local grievance panels—none of whose members are defendants in this case. Finally, the facts that Miller has pled regarding alleged "comparators" do not show that they are similarly situated to her, and therefore do not provide a plausible basis for inferring discriminatory intent under the Rule 12(b)(6) standard. All of this undermines the notion that the Defendants initiated the three pending disciplinary proceedings out of animus towards Miller, her race, or the types of cases she handles. Thus, because Miller "fails to make specific factual allegations to support a claim of bad faith or extraordinary circumstances, the Court finds that it is not required to hold an evidentiary hearing on those issues." *Bhatia v. Conway*, No. 306CV1334 (MRK), 2006 WL 3741189, at *3 (D. Conn. Dec. 19, 2006) (citation omitted).

### 5.  Miller's Requests for Limited Jurisdictional Discovery

Because Miller failed to submit relevant evidence or even to allege facts showing that similarly situated persons were treated differently, she is not entitled to discovery as to her claims of selective prosecution, which is the only type of discovery she has specifically requested. *United States v. Bass*, 536 U.S. 862, 864, 122 S. Ct. 2389, 153 L. Ed. 2d 769 (2002) (*per curiam*). Miller's only specific request to take discovery is limited to the extent to which Defendants investigated Attorney Peters-Hamlin "after they received notice of a basis for

reciprocal discipline." (ECF No. 50.) The showing required to obtain discovery on selective

prosecution cases is demanding; a claimant must submit evidence that similarly situated persons

were treated differently. *Bass*, 536 U.S. at 863 (citing *Armstrong*, 517 U.S. at 465-67). Miller has

failed to submit any evidence that Defendants treated similarly situated attorneys of other races

differently. Therefore, she is not entitled to discovery on her claim for selective prosecution. The

information Miller has provided about the OCDC's actions with respect to Peters-Hamlin show,

if anything, that it sought harsher discipline against Peters-Hamlin than against Miller. (ECF No.

49 at 15, Revised Memorandum of Decision, *Disciplinary Counsel v. Peters-Hamlin*, No.

FSTCV156024364S (Conn. Super. Ct. May 26, 2015).) Although Miller cites an e-mail from

Sutton to Miller suggesting that disciplinary counsel was considering recommending that Miller

be suspended for the conduct based on Judge Meyer's referral (ECF No. 49 at 1), nowhere does

Miller allege that the OCDC actually ever formally recommended that she be suspended from

practicing law. The information Miller provided about Peters-Hamlin, however, shows that Beth

Baldwin of the OCDC (who is not a defendant in this case) asked the Superior Court to enter

"reciprocal discipline" for Peters-Hamlin. (ECF No. 49 at 15, Revised Memorandum of

Decision, *Disciplinary Counsel v. Peters-Hamlin*, No. FSTCV156024364S (Conn. Super. Ct.

May 26, 2015), p. 1.) Peters-Hamlin had been suspended from practice for seven years by the

U.S. District Court for the Southern District of New York. (*Id*.) Apparently, then, Baldwin was

seeking a seven-year suspension against Peters-Hamlin on the basis of a notice of reciprocal

discipline. Miller attached a ruling by a Superior Court Judge *declining* to impose such

reciprocal discipline and "commensurate action" against Peters-Hamlin, which says nothing

about the treatment of Peters-Hamlin by Attorney Baldwin; nor does it say anything about the

intent of any of the Defendants in this case. (*Id*. at 20, *Peters-Hamlin*, p. 6.)

Miller suggests that the OCDC was slow to react in Peters-Hamlin's case, waiting seven years after "the suspensions were first made effective in 2008" to seek reciprocal discipline. (ECF No. 49 at 2.) The information Miller has submitted, however, undermines any notion that members of the OCDC—let alone the Defendants in this case—were more lenient towards Peters-Hamlin. Attorney Baldwin's application for reciprocal discipline (ECF No. 49 at 11, Second Amended Application for Reciprocal Discipline Pursuant to Practice Book §2-39, p. 1) suggests that the timing of the application related to the fact that the original 2008 suspension was appealed, vacated by the Second Circuit in 2011, remanded to the Southern District of New York's Grievance Committee, apparently re-imposed in the district court, and then upheld by the Second Circuit in April of 2014. (*Id.*) That Attorney Baldwin or the OCDC waited until the appeals court affirmed the suspension is not a basis on which to infer that Peters-Hamlin was treated more leniently—or, for that matter, differently from Miller. Miller, too, sought to appeal Judge Meyer's decision dismissing *BBOE,* but, according to her statement at the September 2015 grievance hearing, her appeal was dismissed due to a filing error. (ECF No. 34, Ex. E at 3; *BBOE,* ECF No. 71, Mandate of USCA Dismissing Notice of Appeal.) The dismissal of Miller's appeal on December 10, 2014—and thus the finality of the Rule 11 sanction—occurred before the grievance proceeding based on the Rule 11 referral by Judge Meyer, as in the case of Peters-Hamlin. (*See* ECF No. 34, Ex. B at 1, Grievance Panel Finding of Probable Cause.) None of this provides a basis to require the Defendants to submit to discovery about the OCDC's handling of reciprocal discipline against Peters-Hamlin.

## IV.    CONCLUSION

For the reasons set forth above, the Court GRANTS Defendants' motion to dismiss the TAC (ECF No. 34), and DENIES Miller's motions for limited jurisdictional discovery (ECF No.

50) and reconsideration of the Court's order staying discovery (ECF No. 37). Because the Court

abstains from exercising jurisdiction over Miller's pending disciplinary proceedings, Miller's

motion for a preliminary injunction (ECF No. 12) is also DENIED. The Court GRANTS

Plaintiff's two motions to supplement the record that she filed after briefing was complete. (ECF

Nos. 48, 49.) The Clerk is directed to close this case.


IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                July 21, 2016